## DAVIS *v.* COBLENS.

PRACTICE; CROSS-EXAMINATION; WITNESSES; EJECTMENT; ADVERSE POSSESSION; LIMITATIONS; MARRIED WOMEN; MISJOINDER OF PARTIES.

1. A judgment will not be reversed because of too great latitude allowed by the trial court in the cross-examination of a witness of the losing party to test the credibility of the witness unless there has been a manifest abuse of discretion, especially where the case turned upon an issue upon which the witness was not examined.

2. A trial court has no right to instruct the jury that they must believe an uncontradicted witness notwithstanding it might be improper for them not to do so; and it is not reversible error for the court to instruct the jury that the weight to be given the testimony of such a witness is for them, although it would be better practice to avoid instructions singling out the testimony of particular witnesses.

3. The testimony in an ejectment suit in support of a claim of adverse possession for twenty years examined, and although considered somewhat meagre as to acts of actual possession

during the last two years, held sufficient, in connection with proof of payment of taxes for over twenty years by the adverse claimant and his grantor, to justify the submission of the case to the jury.

4. An action of ejectment to recover from an adverse holder the land of a married woman whose title vested prior to the passage of the R. S. D. C., Secs. 727-8-9, defining the separate property rights of married women, is barred ten years after the removal of the disability of coverture, where the adverse possession has continued for ten years or more prior to the removal of such disability.

5. If in a joint action of ejectment one of the plaintiffs is barred by limitations and can not recover, his coplaintiff can not recover.

No. 694. Submitted October 19, 1897. Decided January 4, 1898.

HEARING on an appeal by the plaintiffs from a judgment on verdict in an action of ejectment. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Franklin H. Mackey* and *Mr. W. Mosby Williams* for the appellants.

*Mr. J. J. Darlington* and *Mr. W. H. Sholes* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This was an action of ejectment brought to recover the possession of part of lot 10 in block 1031 of the city of Washington, and the appellants, Lucy T. Davis, Millard P. McCormick, and the Virginia-Alabama Co., who were the plaintiffs below, appealed from a judgment against them. They claim as heirs at law and grantees of heirs at law of Richard Young, who is the common source of title. The defendants, Louis Coblens and Martin Lauer, and their grantors claimed title under an execution sale upon a judgment against said Richard Young some time in the year 1826. The conveyance under that sale was a nullity because at the time of the levy and sale the defendant in execution had but an equity of redemption in the lot. *Van Ness* v.

*Hyatt,* 13 Pet. 294; *Mayse* v. *Gaddis,* 2 App. D. C. 20, 26.
Consequently, defendants had to fall back upon a claim of
title by adverse possession, upon the evidence of which the
jury found for them.

The chief point of the contention is in respect of the suffi-
ciency of this evidence to warrant its submission to the jury;
but before considering that, several preliminary points re-
quire determination.

2. The first of these arises on an exception taken to the
latitude of cross-examination permitted by the court of one
of plaintiff's witnesses.    The title to a part of the lot in
controversy had once been conveyed by some of the heirs
of Richard Young to one John H. Walter, who had subse-
quently reconveyed to some of the plaintiffs.    The deed was
a general conveyance of lands and interest therein, including
lot 10 aforesaid, by reference to another deed, and contained
a clause, "saving and excepting from this conveyance so
much of all the lands and tenements above mentioned as
had been conveyed by the party of the first part (said Wal-
ter) to other persons prior to," &c.

Walter was offered as a witness to prove that lot 10 had
not been conveyed by him to any one else.    He testified
from memory without having refreshed the same by an
examination of the records.    The cross-examination took a
wide range in respect of the many conveyances the witness
had made within a few years, and the plaintiffs objected
thereto because it was not responsive to the examination in
chief and was not relevant to the issues.    The objection was
overruled.    The latitude to be indulged in the cross-exam-
ination of a witness for the purpose of testing his credibility
varies with the particular circumstances of the case, and is
like that in respect of leading questions, a matter necessarily
very largely within the discretion of the trial court.    *Holtz-
man* v. *Douglass,* 5 App. D. C. 405.    The complaint here
made is that the cross-examination was chiefly for the pur-
pose of showing that the witness was a dealer in speculative

titles, in order to prejudice the jury against him, and through him against the case of the plaintiffs. If such was the purpose, it would have been the duty of the court to repress it. But whilst we are inclined to think that the cross-examination went too far, we can not say that there was an abuse of discretion in permitting it that would justify the reversal of the judgment. Besides, even if there had been error, it would be immaterial. The case evidently turned upon the issue of adverse possession, and this witness did not testify in respect thereof at all. His testimony could have had no appreciable effect upon the result. *W. & G. R. Co.* v. *McLane,* 11 App. D. C. 220; *Glenn* v. *Sumner,* 132 U. S. 152, 157.

3. Another error is assigned on the modification of an instruction asked by plaintiffs in respect of the evidence given by the said witness, John H. Walter.

The instruction was, that as there was no testimony tending to rebut the evidence of the witness as to the fact that he had never conveyed lot 10 to any one before his deed to the plaintiffs, " the jury would not be justified in finding to the contrary." The court struck out these last words and substituted therefor the following: " The weight to be given his testimony is a proper question for the jury." Ordinarily, instructions singling out the evidence of a particular witness ought to be avoided. The court has no right to instruct the jury that they must believe an uncontradicted witness, notwithstanding it might be improper for them not to do so, under all the circumstances, and it was not error to inform them that the weight to be given his testimony was for their consideration, although it would have been better practice to refuse the charge as asked, and omit all reference to the witness. *Met. R. Co.* v. *Jones,* 1 App. D. C. 200, 207. For the same reasons given in discussing the exceptions taken to the cross-examination of the same witness, if error were conceded, the judgment would not be reversed therefor.

4. The next assignment of error is based upon the alleged insufficiency of the evidence of adverse possession to warrant the submission of that question to the jury. No objection is taken to the charge on account of its form; but the contention is that the only instruction proper to be given was to find for the plaintiffs, as requested by them. The substance of that evidence is set out in the bill of exceptions as follows:

"The defendants thereupon further offered evidence tending to prove that on March 8, 1875, Isaac P. Childs & grantee of the whole of square 1031 under a deed from Alexander R. Shepherd, bearing date the 22d day of February, 1875, the same being one of the chain of conveyances offered in evidence by the plaintiffs as tending to show a common source of title, took possession of the whole of said square, converted it into a brick yard, and continued to hold and use it as such, openly, notoriously, exclusively, continuously, and in a manner hostile to all the world, until January, 1892, when he and his immediate grantees sold and conveyed the said square as an entirety to the defendants for sixty-seven thousand dollars, of which thirty thousand was paid in cash and thirty-seven thousand dollars, deferred purchase-money, was secured upon the ground by a deed of trust, upon which the defendants have ever since paid the interest; that by the terms of the sale said Childs & Sons were to be allowed until February, 1893, to remove from said square; that they continued in occupation and possession of the whole of said square under said defendants, paying rent therefor down to the month of October, 1893, with the consent of said defendants, and that they held said square for some time after October without the consent of the defendants, but not disputing their title, being tenants holding over; that they removed the greater part of their effects from said square in the late fall or early winter of 1893–'4, but did not remove entirely until about the month of May, 1895; that the first structure placed by

them on the square when they took possession in 1875 were two or more brick kilns erected on lot 10, and that these kilns were the last from which the brick were removed when they left; that these brick were in process of removal along during the winter of 1893–'94, and that a part of the machinery used by them in the making of brick, namely, two large rollers, with which the clay was crushed before being made into brick, were not removed until May, 1895; that these rollers and some machinery were hauled away in two four-horse wagons as late as about May 20, 1895; that the machine-house was located on the north part of lot 1, in said square, at or about a point indicated by the witness, Charles Childs, on a plat of the square exhibited to the jury, and that the rollers and machinery were north of the machine-house; and on cross-examination in regard thereto the said Charles Childs testified as follows:

"'I don't know but what the rollers might have been on lot 10. The machine-house stood right in here (indicating), and the rollers might have been on lot 10.'

"The defendants further offered testimony tending to show that in November, 1893, the defendant caused four signs to be posted, each about four feet square, to the effect that the entire square was for sale or rent on application to them, one at each corner of the square, one of them being located on lot 10; that some of the old brick were left on the ground, which the witness thought Childs & Sons abandoned, but they did not charge defendants for them, which were suitable for use in building, and were still there; that defendants made no use of them, but that witness thought they would have used them if they had gone into building operations; that either in the latter part of March or the first part of April, 1894, the defendants rented the entire square to one John A. Downing, who rented it for the purpose of converting it into a base-ball park, but did not use it for that purpose; that he occupied the house which was on lot 7 for a dairy lunch and sublet a portion

of said house for a barber shop; that the acts he did in reference to the occupation of the vacant ground in that square were as follows: That he prevented various parties from depositing tools, tool-boxes, and railroad iron on the square, though none was attempted to be deposited on lot 10; that on the said square there were a couple of holes where the brick kilns had existed, and that there are the foundations of some kilns built of brick still there, and that the said Downing remained as such tenant in occupation of the said square, as aforesaid, until June, 1895, when he sold his dairy lunch to a Mrs. Schulz, who took possession the same day; that after Isaac Childs and Sons left the square, which was in the winter of 1893–'4, perhaps along in November, December, January, and February, they sold certain brick kilns, some of which were on lot 10, to James D. Childs, who in turn sold them to others, by whom they were taken away; that said James D. Childs did not claim the land said bricks were on; that Mrs. Schulz continued in occupation of the property from June, 1895, down to the time of the trial; that she rented the house with the privilege of using the entire square, provided she neither placed nor permitted others to place anything unlawful upon it, and that she had stopped parties from dumping earth upon the square and from driving across it, though she made no use of it herself.

" The defendants thereupon produced as a witness in their behalf Goff A. Hall, assistant assessor of the District of Columbia, who gave testimony tending to prove that he had examined the tax books from 1875 down to the time of the trial, and that throughout that period the taxes on said lot 10 had been assessed and paid in the name of the defendants and those under whom they claimed.

" Thereupon the plaintiffs in rebuttal gave testimony tending to prove that the brick yard was established some time in the fall of the year 1875 and disappeared some time in 1893, leaving nothing remaining but the remnants of the

old brick yard, and that the bricks were all removed from the kilns about March or April, 1894."

In addition, it was shown that the defendants and those under whom they claimed had paid all the taxes assessed against the said lot 10 from year to year since 1875. The testimony requires no review. Though somewhat meagre as regards the last two of the required twenty years of adverse possession, we are of the opinion that, in connection with the proof of the regular payment of taxes by the defendants, the evidence was sufficient to warrant its submission to the jury. The case is not distinguishable from *Holtzman* v. *Douglass*, 5 App. D. C. 397, 412; S. C., Supreme Court U. S. (November, 1897), 168 U. S. 278.

5. The next question is, conceding the proof of twenty years' adverse possession by defendants, could the statute of limitations be said to have run against the plaintiffs' title acquired through Tracenia Latimer and Elizabeth McCormick?

An instruction embodying a negative answer was refused as to both, and error is assigned thereon.

As we have seen above, defendants' adverse possession began on February 22, 1875. Richard Young, the common source of title, died July 30, 1860, leaving a will. After making certain specific devises, none of which included lot 10, he devised the residue of his estate to his widow Matilda for life, with remainder in fee to his five children, including the said Tracenia and Elizabeth. Both these were married at that time. Tracenia died November 15, 1879, and her husband April 20, 1880. She left two children, one of whom is the plaintiff, Lucy T. Davis. Lucy Davis was married before the death of the life tenant, Matilda, which occurred October 7, 1874.

Elizabeth married before her father's death, and died March 22, 1889, leaving a husband, who died July 2, 1891. October 14, 1887, the said Elizabeth and her husband conveyed their interests to their son, the plaintiff,

Millard P. McCormick. The suit was begun May 17, 1895.

(1) As the estates of Tracenia Latimer and Elizabeth McCormick vested before the passage of the act defining the separate property rights of married women, and permitting them to convey, devise and bequeath the same, and to contract, sue and be sued in matters having relation thereto, in the same manner as if unmarried (R. S. D. C., Sections 727, 728, 729), their husbands' rights by the curtesy and their own disabilities in respect of the conveyance thereof were not removed. *Hitz* v. *Nat. Met. Bank,* 111 U. S. 722, 729, 730; *Hitz* v. *Jenks,* 123 U. S. 297; *Kaiser* v. *Stickney,* 131 U. S. Appendix, clxxxvii; *Cammack* v. *Carpenter,* 3 App. D. C. 219, 227; *Frey* v. *Allen,* 9 App. D. C. 400, 404.

Nor, for the same reason, could the wife have brought an action of ejectment in her own name, or without joinder of her husband. *White* v. *Hilton,* 2 Mackey, 339, 344.

It follows, therefore, that both of the married women aforesaid were within the provisions of the saving clause of the statute of limitations when the adverse possession of the defendants and those under whom they claim began. 21 Jac. 1, Ch. 16, Sec. 2; Compiled Stat. D. C., p. 359, Sec. 2.

It is unimportant to consider whether the statute, thus suspended, began to run from the date of the death of the wife or from that of her surviving husband, for the result would be the same in either event. Nor is it material to consider the disabilities under which the heirs of each married woman may have labored at the time of descent cast, as there can be no lacking of one to the other.

(2) The right derived through Tracenia Latimer was unquestionably barred, because more than ten of the requisite twenty years of uninterrupted adverse posession had elapsed after the death of both her and her surviving husband. Had she survived her husband she would not have had twenty years from the time of the removal of her disability within which to bring her action, but the ten years only

provided in the saving clause of the statute. The rule of construction of that clause is that if more than ten of the twenty years' adverse possession required to ripen into title shall remain unexpired at the time the disability ceases, there shall be no extension of the time in favor of the party beyond the said twenty years; but if the whole period of twenty years, or more than ten years thereof, shall have expired, then the party shall have the full ten years from the date of the disability removed within which to commence action and prevent the bar. *Demorest* v. *Wynkoop*, 3 Johns. Ch. 129; *Smith* v. *Burtis*, 9 Johns. 174; *Jackson* v. *Johnston*, 5 Cow. 74.

(3) Under the foregoing rule, the right of the plaintiff, Millard McCormick, derived by conveyance from Elizabeth McCormick and her husband, was not barred at the time the suit was begun. Counting the statute as commencing to run at her death, or that of her husband, or at the date of the conveyance aforesaid, the ten years saved to her had not expired.

But this condition could not avail him in the action as brought. Having joined with the plaintiffs representing the claim of Tracenia Latimer, his right falls with theirs.

The rule is old and well established, that if one plaintiff in a joint action of ejectment cannot recover, his coplaintiffs cannot. *Morris* v. *Wheat*, 8 App. D. C. 379, 385. Hard as this rule may seem to be, it was followed in that case in obedience to the decision of the Supreme Court of the United States in *Marsteller* v. *McLean*, 7 Cranch, 156, 159. In that case Mr. Justice Story said:

"It seems to be a settled rule that all the plaintiffs in a suit must be competent to sue, otherwise the action cannot be supported;" and again: " When once the statute runs against one of two parties entitled to a joint action, it operates as a bar to such joint action." See, also, *Shipp* v. *Miller*, 2 Wheat. 316, 324; *Dickey* v. *Armstrong*, 1 A. K. Marshall, 39, 40.

This was not only the settled rule then, but remained so for years in the majority of the States until changed by statutes regulating the practice in such cases. See cases cited in *Morris* v. *Wheat, supra.* p. 385; and in addition thereto *Chandler* v. *Simmons,* 97 Mass. 508; *Kelley* v. *Meins,* 135 Mass. 231, 235; *Waterman* v. *Andrews,* 14 R. I. 589, 599; *May* v. *Slade,* 24 Tex. 205, 207.

There has been no legislation affecting the rule of practice in the District of Columbia, and we do not consider it within our province to make a change therein.

The apparent hardship to this plaintiff might have been avoided by a separate suit on his own behalf.

The original rule at common law was, that tenants in common could only sue separately because they were separately seized, and there was no privity of estate between them. *Mobley* v. *Brunner,* 59 Pa. St. 481; *Corbin* v. *Cannon,* 31 Miss. 570, 572; *May* v. *Slade,* 24 Tex. 205, 207; 4 Kent Com. 368.

The practice soon became general, however, in the United States, to permit them to sue either jointly or severally as they might elect. 7 Enc. Pl. & Pr. 316, and cases cited. This seems to have been the practice in the District of Columbia, and, so far as we are advised, has never been questioned. Tenants in common may join in an action if they prefer to do so, but it is with the risk of the failure of all if one of them fail to make out a title or right to possession.

For the reasons given the judgment must be affirmed, with costs. *Affirmed.*